UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| HITACHI AUTOMOTIVE SYSTEMS AMERICAS, INC., | ) ) | |
| | ) | Case No. |
| Plaintiff, | ) | 5:19-cv-184-JMH |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| TI AUTOMOTIVE LIGONIER CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*

This matter was recently transferred to the undersigned because it is related to another matter pending before this Court, *Hitachi Auto. Sys. Am., Inc. v. TI Auto. Ligonier Corp.*, No. 5:18-cv-438-JMH-MAS. In the above-captioned action, Plaintiff Hitachi has filed a motion for a temporary restraining order ("TRO") and preliminary injunction. [DE 3]. Hitachi seeks a court order requiring TI Ligonier to immediately resume production and shipment of certain parts pursuant revised design specifications. [DE 3-1 at 20-21, Pg ID 81-82].

After reviewing the motion and accompanying materials, the Court does not have sufficient information to demonstrate that Hitachi will suffer immediate irreparable harm without an ex parte TRO. As a result, Hitachi's motion for a TRO is **DENIED** at this time.

Still, the Court will withhold consideration of Hitachi's motion for a preliminary injunction until a hearing may be held. As such, a **MOTION HEARING** on the motion for preliminary injunction [DE 3] is scheduled for **Wednesday, May 1, 2019, at 2:00 p.m.**, subject to intervening orders of the Court.

## I. Factual & Procedural Background

Hitachi Automotive manufactures automotive systems for major automotive manufacturers. [DE 3-1 at 3, Pg ID 64]. To that end, Hitachi has multiple contracts with TI Ligonier for the supply of automotive parts. [*Id.*]. Two of those requirement contracts appear to be relevant to the instant motion.

On February 26, 2016, the parties entered into Requirements Contract No. B015833 ("Gen-1 Requirements Contract") where the TI agreed to manufacture and supply 100% of Hitachi's requirements for Gen-1 LFY LH Rail parts. [DE 3-1 at 4, Pg ID 65; DE 3-2 at 2, Pg ID 85]. Then, on August 4, 2016, the parties entered into Requirements Contract No. B015894 (".675T Requirements Contract") where TI agreed to manufacture and supply 100% of Hitachi's requirements for .675T Bare Fuel Rail parts. [DE 3-1 at 4, Pg ID 65; DE 3-3 at 2, Pg ID 87]. Hitachi asserts that both parts are critical components in Hitachi's fuel rail systems.[1]

---

[1] The Court will refer to the Gen-1 Rail parts and the .675T Bare Fuel parts as "the parts" collectively. Similarly, the Court will refer to the requirements contracts collectively as "the contracts."

A "special note" at the bottom of the contracts expressly limits the requirements contracts to the terms stated in the contracts themselves "and the terms and conditions of purchase set forth in Hitachi Automotive Systems Americas, Inc.'s, Supplier Handbook." [See DE 3-2; DE 3-3 (emphasis omitted)]. Pursuant to the terms and conditions, time is of the essence, and TI is obligated to manufacture and deliver the parts to Hitachi on the delivery date, in conformity with specific engineering requirements, and for the contractually agreed price certain per part. [DE 3-1 at 5, Pg ID 66].

But the present dispute relevant to this motion is about design changes to the parts that Hitachi claims it is contractually permitted to make. Section 15.9 of the terms and conditions says,

> These terms may be modified only in writing signed by authorized representatives of buyer and supplier. However, buyer may, at any time, by written change order, make changes in: . . . (B) the drawings, designs or specifications applicable to the goods or services covered by this order. . . . If such changes materially affect the time for performance, the cost of manufacturing the goods, or the costs of furnishing services, buyer will make an equitable adjustment in the purchase price or the delivery schedule or both. Any dispute with respect to an equitable adjustment shall not relieve seller of its obligation to perform in accordance with a written change order.

[DE 3-4 at 11, Pg ID 98].

According to Hitachi, General Motors ("GM") mandated a change in specification pertaining to the parts at issue through an Engineering Work Order ("EWO") in November 2018. [DE 3-1 at 6, Pg

ID 67]. To effectuate these mandated changes, Hitachi claims that
it notified TI Ligonier of the requested specification changes on
December 13, 2018. [*Id.*]. According to Hitachi, the parties
worked together for several months to implement the EWO change and
eventually reached a solution to the specification change that was
ready to be submitted to GM for testing and approval. [*Id.*].

Subsequently, Hitachi claims that they submitted a request
for quotes to TI regarding additional costs for the parts based on
the change in specifications.[2] [*Id.*]. Hitachi claims that TI only
responded to the request for quote for the .675T Bare Fuel Rail
parts, as evidenced by an email from Scott Hacias, Senior Manager
of Business Development at TI, and that the offered quote was 11%
higher than the original price per part. [DE 3-1 at 7, Pg ID 68;
DE 3-5 at 4-5, Pg 104-05]. Hacias's email also provided a lead
time for the prototype of six to seven weeks and a production lead
time of fourteen weeks. [DE 3-5 at 4-5, Pg ID 104-05].

On April 8, 2019, Anne Wells, a Hitachi Procurement Manager,
followed-up on the quoted price, stating in part,

> GM is pushing hard for a cost breakdown for quotes (see
> summary below).

---

[2] Hitachi sent an email inviting TI to offer a quote for one of
the parts, apparently the .675T Bare Fuel Rail, on April 2, 2019.
[*See* DE 3-5 at 5-6, Pg ID 105-06]. Hitachi claims that they also
sent an offer for quote for the Gen-1 Rail parts on March 25, 2019,
but there is no apparent objective proof of this offer in the
record before the Court.

The quote is much higher than expected and we need a cost breakdown to better understand the cost drivers so that we can better explain.

It seems they are unwilling to wait until Scott's return next week and have demanded that we escalate which is the cause for this email. If there any way you would have someone that could support us in completing the attached worksheet in support of the submitted quote?

[DE 3-5 at 3-4, Pg Id 103-04].

Then, relations apparently soured. In response to Hitachi's request for a cost breakdown, Todd Pontillo, a TI employee, responded to Wells's email and said,

As a general matter, Hitachi has not demonstrated any willingness to work with, or have a collaborative or cooperative partnership with, TI. As such, TI is not interested in expanding our commercial relationship with Hitachi in any way.

TI withdraws its prior engineering estimate for this new product design/specification and will not be providing any further estimates or quotes. Instead, we are only willing to supply the product in accordance with current contract specifications.

[DE 3-5 at 3, Pg ID 103].

Wells responded on April 11, 2019, saying in relevant part,

I am sure you are aware that this is not an expansion of business, however, it is for contracted business that TI Automotive is currently providing.

The change is directed by the OEM and our Terms and Conditions clearly allow Hitachi to do so.

We have made multiple attempts to provide TI with the opportunity to provide costs associated with the customer directed engineering change.

If Hitachi does not receive updated cost that accurately detail the change, we will be forced to assume

5

that TI has no cost impact and will take necessary steps to implement.

Your response is appreciated by the COB today, as GM has become very impatient due to the lack of response from TI Automotive.

[DE 3-5 at 2, Pg ID 102]. It does not appear that TI responded to Wells's April 11th email. Hitachi claims that it uploaded the revised specification drawings on the supplier portal on April 17, 2019. [DE 3-1 at 7, Pg ID 68].

Next, on April 19, 2019, Hitachi sent a demand letter to TI asserting that TI was refusing to supply parts that it was contractually obligated to supply and requesting assurance of compliance by noon on Monday, April 22, 2019. [DE 3-6 at 2-4, Pg ID 108-10]. In response, TI sent a letter dated April 23, 2019, claiming that the new design specification requested by Hitachi constituted a new part for which there was no requirements contract in place. [DE 3-7 at 2, Pg ID 112]. Additionally, TI stated that it "would prefer to resolve this matter amicably without further escalation, if possible. To that end, and as a sign of good faith, TI Ligonier is prepared to engage in further dialogue with Hitachi in an effort to reach a resolution." [Id.]. TI stated that "[a]ny resolution will need to include steel surcharges, steel tariffs, and other commercial issues." [Id.]. Finally, TI asserted that Hitachi was in breach for failure to pay steel surcharges and tariffs and asserted that "TI Ligonier cannot afford and is not

obligated to continue taking on this significant and growing financial risk." [*Id.* at 2-3, Pg ID 112-13]. It does not appear that the parties engaged in any communication after this letter from TI Ligonier.

Of course, things did escalate because, on April 25, 2019, Hitachi filed a verified complaint in the above-captioned action claiming that TI Ligonier had breached the contracts by refusing to take necessary steps to supply parts that comply with the safety critical design specifications supplied by Hitachi, for failing to sort certain parts, and for failure to attend weekly quality assurance meetings. [DE 1 at 11-12, Pg ID 11-12]. Hitachi's verified complaint seeks declaratory judgment and specific performance. [*Id.* at 12-16, Pg ID 12-16].

Now, Hitachi moves for a TRO and preliminary injunction to order TI Ligonier to immediately resume production and shipment of the Gen-1 LFY LH rail parts and the .675T Bare Fuel Rail parts. At the time of writing, TI Ligonier has not appeared in the above-captioned action. But Hitachi certified that it served TI's registered agent for service of process and served counsel for TI via email and FedEx overnight delivery with the motion for TRO and preliminary injunction and the memorandum in support on April 25, 2019. [See DE 3 at 3, Pg ID 61; DE 3-1 at 22, Pg ID 83]. At present, Hitachi's motion is ripe for initial review.

## II.  Analysis

"The factors to be weighed before issuing a TRO are the same as those considered for issuing a preliminary injunction." *Contrech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 814 (E.D. Mich. 2013) (quoting *Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 807 (E.D. Mich. 2012)).  Thus, when a party seeks a temporary restraining order, the Court must consider: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.  *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *see also Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016).  These are "factors to be balanced, not prerequisites that must be met." *Tenke Corp.*, 511 F.3d at 542. For example, where a party makes "an extremely strong showing of irreparable harm" they are "not required to make as strong a showing of a likelihood of success on the merits." *Stein*, 672 F. App'x at 569.  The relevant factors are considered below.

### A.  Motion for TRO

The Federal Rules of Civil Procedure outline the appropriate procedure before a court may grant an ex parte TRO.  The Rules state,

The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). The Court must consider four factors to determine whether issuance of an ex parte TRO is warranted.

**(1) Substantial Likelihood of Success on the Merits**

At this juncture, Hitachi has provided sufficient factual information to demonstrate a substantial likelihood of success on the merits. The motion and verified complaint, and the accompanying attachments, demonstrate that TI is contractually obligated to incorporate specification changes to the parts at Hitachi's request.

Of course, the Hitachi terms and conditions entitle TI to an equitable adjustment in price of the parts if the changes materially alter the cost to make the parts. But even if there is a dispute about the proper equitable adjustment, TI agreed that a "dispute with respect to an equitable adjustment shall not relieve the seller of its obligation to perform in accordance with a written change order." [DE 3-4 at 11, Pg ID 98]. As such, TI appears contractually obligated to incorporate new design

specifications at Hitachi's request, even if a dispute exists about the proper equitable adjustment in price.

Of course, that is not to say that TI will not present defenses to its obligation to perform or that TI will not ultimately succeed on the merits. But there is no apparent defense or factual information currently before the Court that justifies TI's noncompliance with its contractual obligations.

In response to Hitachi's demand letter, TI provided two primary explanations for its refusal to incorporate the design changes. But these explanations are unavailing without some additional evidence.

First, TI claimed that the new design specification submitted by Hitachi constitutes a new part number, independent of the contracts, and is not simply a revised design for the previous .675T part. [DE 3-7 at 2, Pg ID 112]. Still, based on the facts before the Court, a reasonable person would likely view that argument skeptically. It appears that Hitachi and TI communicated and cooperated for a few months to incorporate the new design specification to the parts that was mandated by GM. In fact, the parties engaged in email correspondence and had worked on a prototype for approval from GM and TI submitted a new quote on the costs for the parts. [DE 3-5]. It appears that the instant dispute between the parties began when Hitachi asked for a cost breakdown for the new quoted price in an email on April 8, 2019.

[*Id*. at 3-4, Pg Id 103-04].  It appears that the first time that TI claimed that this new design specification constituted a new part instead of a design specification change for an existing part was on April 23, 2019.  [DE 3-7 at 2, Pg ID 112].  As such, it is a bit difficult to believe, without some other proof, that TI genuinely believes the design specifications constitute a new, independent part that TI is not obligated to revise under the existing contracts if they worked with Hitachi on the new design specifications for approximately four months without raising this complaint or argument independent of this dispute.

Second, TI complained about Hitachi's failure to pay steel surcharges and tariffs, claiming Hitachi was in breach for refusal to pay these costs.  [DE 3-7 at 2-3, Pg ID 112-13].  But TI pointed to no contractual provision that requires Hitachi to pay for these costs.  Moreover, there is no apparent provision in the Hitachi terms and conditions of purchase that require Hitachi to make a price adjustment based on an increase in the costs of raw materials.  It appears that the parties agreed that the base price would be fixed by the price on the purchase order.  On the one hand, TI may be entitled to an increase in price based on an equitable adjustment, but it does not appear that this equitable adjustment must account for a change in price of raw materials needed to incorporate the revised design specifications.  Even so, a dispute about an equitable adjustment in price does not appear

to relieve TI of its obligation to perform under the contracts. Ultimately, it appears that TI is obligated to incorporate the required change in design specification based on the contracts and, while TI is entitled to an equitable adjustment, TI likely cannot use the underlying dispute as leverage to negotiate a more favorable price based only on an increase in the costs of raw materials.

Based on the foregoing analysis, Hitachi has provided sufficient proof to demonstrate a substantial likelihood of success on the merits. As a result, the first factor weighs in favor of granting a TRO.

**(2)   Irreparable Injury Without the Injunction**

Hitachi has submitted proof that it will suffer irreparable injury without some injunctive relief from this Court. Still, based on the evidence submitted to the Court, it is unclear if Hitachi will suffer *immediate* irreparable injury that warrants the grant of an ex parte TRO before TI has an opportunity to respond and a hearing may be held.

"Irreparable harm is generally defined as harm that cannot be fully compensated by monetary damages." *Wilson v. Bd. Of Educ. Of Fayette Cty.*, 2015 WL 4397152 (E.D. Ky. July 16, 2015) (citing *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). Hitachi argues that the irreparable harm without a TRO would include harm to Hitachi, its employees, its

customers, and General Motors (who relies on Hitachi for fuel rail systems). The Court understands that if TI fails to deliver parts to Hitachi that, in turn, Hitachi will be unable to manufacture and deliver parts to GM and potentially other automotive manufacturers, which could delay GM's manufacturing processes.

Additionally, any delay in production of the fuel rail systems may potentially result in Hitachi suffering from a loss of good will with GM, which would also constitute irreparable harm. The Sixth Circuit and district courts have found that such harm is irreparable. *See TRW, Inc. v. Indus. Sys. Assocs. Inc.*, 47 F. App'x 400 (6th Cir. 2002) (per curiam) (finding irreparable harm where an automobile component supplier would have to shut down its operations); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); *Stryker Corp. v. Bruty*, No. 1:13-cv-288, 2013 WL 1962391, at *6 (W.D. Mich. May 10, 2013).

Even so, to grant an ex parte TRO, this Court must also determine that the irreparable harm suffered by Hitachi will be *immediate*. "An ex parte TRO is only appropriate where the applicant would face irreparable harm so immediate that it would be improper to wait until after a preliminary injunction hearing to enjoin the non-movant's conduct." *Erard v. Johnson*, 905 F. Supp. 2d 782, 791 (E.D. Mich. 2012). "In view of the possibly

drastic consequences of a temporary restraining order, the opposition should be heard, if feasible, before the order is granted." Advisory Committee Notes on 1966 Amendment to Fed. R. Civ. P. 65.

Hitachi claims that the harm they will suffer will be immediate without injunctive relief, but just because Hitachi says so does not mean that the objective evidence before the Court supports that conclusion. What is unclear at this juncture is when the design specification change must be incorporated by TI, what additional steps, if any, must be taken before TI may start manufacturing the parts with revised specifications, and *when* Hitachi and GM's production processes may be negatively impacted by TI's failure to provide parts.

It appears that these parties have been working together to incorporate these updated or revised design specifications for months. In the meantime, Hitachi has presumably continued to manufacture fuel rail systems using parts from TI under the initial design specifications. Additionally, Hitachi asserts that they uploaded revised design specifications (presumably that were approved or edited by GM) on April 17, 2019. Still, it is unclear if that constituted the final step in the design process such that TI could immediately start producing the revised parts, or whether TI would be entitled to additional time to incorporate the changes and manufacture the revised parts. Thus, it is unclear when the

parts with the revised specifications are required, when TI is obligated to provide said parts, and when TI's failure to provide those parts will result in irreparable harm.

Ultimately, Hitachi may not demonstrate a risk of *immediate* irreparable harm by simply stating that such harm will be suffered. If TI's failure to provide parts will result in immediate stoppages to Hitachi's production processes or other immediate irreparable harm, Hitachi must say so and provide proof or explanation about *when and how* that immediate harm will result without injunctive action. Otherwise, without such proof, TI should be entitled to respond to Hitachi's motion before the Court grants any injunctive relief.

At bottom, while Hitachi provides a compelling case that they will suffer irreparable harm without injunctive relief at some point, it is unclear if such irreparable harm will likely be suffered today, next week, or a next month. Until it is clear that Hitachi will suffer immediate irreparable harm before a Court hearing without immediate injunctive relief, the Court must deny Hitachi's request for an ex parte TRO.

**(3)  Substantial Harm to Others and Public Interest**

Hitachi has demonstrated a compelling case that no third parties that are not parties to this lawsuit will be harmed by injunctive relief. In fact, it appears that third-party harm may eventually result without some injunctive relief from the Court as

production delays at Hitachi may result in delays in production at GM and other major automotive manufacturers.

Additionally, the public interest is best served in this instance by holding the parties to the terms of their agreement. *See Tenke Corp.*, 511 F.3d at 551 (ruling that holding Defendants to the terms of their agreement weighed in favor of injunctive relief). Holding parties to the terms of their agreements ensures contracting parties that the provisions in their contractual agreements and contractual expectations, assuming the provisions and expectations are clear and lawful, will not be altered.

Still, the request for injunctive relief in this instance suffers from another flaw, it is unclear precisely what relief Hitachi seeks from this Court. Hitachi's proposes that this Court order TI Ligonier to "immediately presume production and shipment of the Parts pursuant to the revised design specification." [DE 3-9 at 6, Pg 124]. But, by Hitachi's own admission, TI just received the revised design specifications on April 17, 2019. As a result, it is unclear if TI has produced or shipped any of the parts pursuant to the revised design specifications, or whether TI could comply with such order immediately. Again, the future timeline for production is not clear. For instance, it is unclear if the revised design specifications were the final step in the design process or whether additional design and prototype testing is needed before the parts with the revised design specifications

may be produced. Additionally, even assuming the revised specifications were the final piece of information that TI needed before production could occur, it is unclear what amount of preparation time, if any, is required so that TI can set up its production lines to develop the parts with the revised design specifications or whether TI requires some time to ensure that it can obtain the raw material to design these updated parts.

Ultimately, Hitachi must provide this Court with sufficient information so that it may draft injunctive language that is sufficiently clear and precise such that it may put the non-moving party on notice as to what it is being ordered to do. Here, even if the Court granted Hitachi's requested injunctive relief verbatim, it is not entirely clear based on the facts provided what that would require TI Ligonier to do.

For instance, based on the necessity of preparations for production or additional design testing, it may be impossible for TI to produce and ship the parts pursuant to the design specifications at this time. To the extent that TI must perform additional design testing or production preparations are required, the Court should order TI Ligonier to perform those actions.

At bottom, it is unclear whether the Court may reasonably order TI Ligonier to produce and ship the parts with the revised design specifications because it is not entirely clear to the Court whether the revised design specifications sent to TI are the final

specifications and, if so, whether TI must be given some time to incorporate those changes before production can occur, or whether TI has actually produced a part with the new revised specifications. On this point, the Court simply needs more clarity about the production process and exactly what Hitachi alleges TI is not doing that it should be doing under the contracts. Otherwise, the Court risks imposing injunctive relief with which TI cannot comply, which would potentially cause substantial harm to TI itself.

In sum, while Hitachi has demonstrated a strong likelihood of success on the merits and that the public interest would best be served by holding the parties to their initial bargain, Hitachi has failed to provide sufficient proof to demonstrate that it will suffer immediate irreparable harm and the Court has concerns about the broad scope of the prospective injunctive relief. As such, without additional information to address these concerns, the Court must deny Hitachi's request for an ex parte TRO at the present time.

## B. Preliminary injunction

The Federal Rules of Civil Procedure state that a "Court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a). While information notice may be sufficient for the Court to grant an ex parte TRO to preserve the status quo, "[t]he notice required by Rule 65(a) before a

preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Almeda Cty.*, 415 U.S. 423, 432 n.7 (1974). As such, the non-movant, TI Ligonier, is entitled to a hearing and a fair opportunity to respond, including time to prepare a response to oppose the motion, before a preliminary injunction may be granted. In the meantime, the Court encourages the parties to engage in amicable discussions aimed at reaching a joint resolution of the present dispute.

### III. Conclusion

Based on the foregoing, Hitachi's motion for an ex parte temporary restraining order is **DENIED** because Hitachi has failed to demonstrate that it will suffer immediate irreparable harm before TI has an opportunity to respond and a hearing may be held. Moreover, the Court is not entirely clear on the production timeline for producing the parts with revised design specifications and, as a result, is not sure what precise injunctive relief Hitachi claims it is entitled to.

Still, the Court will withhold consideration of Hitachi's motion for a preliminary injunction until an evidentiary hearing is held.

Accordingly, **IT IS ORDERED** as follows:

(1) Hitachi's motion for a temporary restraining order is **DENIED**;

(2) The Court will withhold consideration of Hitachi's motion for a preliminary injunction [DE 3] until a hearing may be held. As such, this matter is set for a **MOTION HEARING** on **Wednesday, May 1, 2019, at 2:00 p.m.**, at the United States Courthouse in Lexington, Kentucky, subject to intervening orders of the Court;

(3) The parties will be unable to operate under the normal briefing schedule outlined in Local Rule 7.1(c). Still, the parties **may file simultaneous briefs in support of their respective positions on or before Tuesday, April 30, 2019, at 5:00 p.m.** These briefs shall be filed electronically and shall not exceed 3,500 words in length;

(4) The Clerk of this Court **SHALL** serve a copy of this Order by facsimile on attorney Matthew K. Paroly, Vice President and Chief Legal Officer for TI Automotive; and

(5) Counsel for the Plaintiff **SHALL** also make a reasonable effort to inform counsel for the Defendant of this memorandum opinion and order and the upcoming motion hearing.

This the 26th day of April, 2019.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge